IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ELITE INTEGRATED MEDICAL, LLC, f/k/a SUPERIOR HEALTHCARE OF WOODSTOCK, LLC (d/b/a SUPERIOR HEALTHCARE GROUP), DR. ATLEE WAMPLER, IV, D.C.M.S., and FITE HEALTH AND WELLNESS CENTER, LLC, f/k/a SUPERIOR HEALTHCARE GROUP OHIO, | : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. |
| v. | : : : | 1:19-cv-5214-AT |
| NEW WORLD COMMUNICATIONS OF ATLANTA, INC., d/b/a FOX 5 ATLANTA, | : : : : | |
| Defendant. | : : | |

**<u>OPINION  AND ORDER</u>**

In this case, Plaintiffs bring defamation claims against Defendant New World Communications of Atlanta, Inc., ("NWCA") for the actions of its television station WAGA-TV FOX 5 Atlanta ("Fox 5 Atlanta")[1], for Fox 5 Atlanta's publication of allegedly false and defamatory statements about Plaintiffs during a series of news reports between November and May of 2019. After jurisdictional discovery,

---

[1] While Plaintiffs styled the case as being brought against NWCA "d/b/a" Fox 5 Atlanta, NWCA explains that it "is not registered as a 'D/B/A' nor does it operate as a 'D/B/A.'" (Motion to Dismiss ("Mot."), Doc 64 at n. 1). Rather, WAGA-TV Fox 5 Atlanta is the name of the broadcast station operated by NWCA under its FCC license. (Deposition of Carolyn Forrest ("Forrest Dep.") p. 209:13-14.) The Court notes that the Parties agree that "WAGA," "Fox 5," and "NWCA" all refer to the same entity, the Defendant in this case. (Forrest Dep. p. 14:8-23.)

NWCA has filed anew its Motion to Dismiss for Lack of Subject Matter Jurisdiction [Doc. 64], now before the Court. For the reasons below, the Court **GRANTS** NWCA's Motion [Doc. 64] and **DISMISSES** this case for lack of jurisdiction.

## I.    Background

In November of 2019, Plaintiffs filed this action, alleging that NWCA reported false and defamatory information about their regenerative medicine practices and conduct in news coverage between May and November of that year. (Complaint, Doc. 1.) Plaintiffs allege that NWCA produced broadcasts and published articles conveying the message that Plaintiffs were participating in a fraudulent and deceptive business scheme, including by misleading patients about regenerative stem cell therapy treatment. (*Id.* ¶¶ 381, 433, 479, 511.) The 144-page, 540-paragraph Complaint alleges state-law claims for "defamacast," libel, attorneys' fees, and punitive damages.

Shortly after this action was filed, Defendant NWCA filed an initial motion to dismiss for lack of subject matter jurisdiction (Doc. 6), arguing that Plaintiffs' asserted basis for federal jurisdiction was lacking. NWCA argued that there was not complete diversity amongst the Parties because Defendant NWCA's principal place of business is in Georgia, not California. In December 2020, the Court granted the Parties' request to pursue jurisdictional discovery regarding the diversity of citizenship issues raised by NWCA's Motion. (Doc. 10.) Numerous extensions of the discovery period were granted, and the Court denied without prejudice Defendant's Motion (Doc. 6), directing NWCA to refile the motion upon

conclusion of the discovery period. On November 30, 2020, NWCA did just that and filed anew its Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 64). Plaintiffs then filed their Response (Doc. 72) and NWCA replied (Doc. 79).

The citizenship of each Plaintiff, though not included in the Complaint, is not disputed by the Parties. According to the Parties' Stipulation (Doc. 50), Plaintiff Elite is a citizen of the state of Florida, as is Plaintiff Fite Health and Wellness Center, LLC, f/k/a Superior Healthcare Group Ohio ("Fite").[2] The Complaint alleges, and Defendant agrees, that Dr. Atlee Wampler is a citizen of Georgia. (Complaint, Doc. 1 ¶ 11.) As noted above, the crux of the dispute concerns the citizenship of Defendant NWCA. While Plaintiffs allege that NWCA is a "foreign

---

[2] According to the Stipulation, Elite's sole member is a Florida Limited Liability Company. (Doc. 50 ¶ 1.) Similarly, Fite's sole member is also a Florida Limited Liability Company. (*Id.* ¶ 2.) The Court notes that the *Complaint* does not identify the citizenship of either Elite or Fite but only states that Elite "is a domestic limited liability corporation organized and existing under the laws of the state of Georgia" (Compl. ¶ 10) and that Fite "is a foreign limited liability corporation organized and existing under the laws of the State of Ohio" (*id.* ¶ 12). For purposes of diversity jurisdiction, limited liability companies and limited partnerships are citizens of any state of which a member of the company or partnership is a citizen. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004); *see also Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990). "To sufficiently allege the citizenships of these unincorporated business entities, a party must list the citizenships of *all* the members of the limited liability company and *all* the partners of the limited partnership." *Rolling Greens MHP, L.P.*, 374 F.3d at 1022 (emphasis added). And "[w]hen determining citizenship of the parties for diversity jurisdiction purposes, a limited liability company (LLC) is a citizen of every state that any member is a citizen of. And it is common for an LLC to be a member of another LLC. Consequently, citizenship of LLCs often ends up looking like a factor tree that exponentially expands every time a member turns out to be another LLC, thereby restarting the process of identifying the members of that LLC." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1220 (11th Cir. 2017); *RES–GA Creekside Manor, LLC v. Star Home Builders, Inc.*, No. 10-cv-207-RWS, 2011 WL 6019904, at *3 (N.D. Ga. Dec. 2, 2011) (Story, J.) (quoting *Multibank 2009–1 RES–ADC Venture, LLC v. CRM Ventures, LLC*, No. 10–cv–02001, 2010 WL 3632359, at *1 (D. Colo. Sept. 10, 2010)). Here, the Complaint does not properly identify the citizenship of Elite or Fite, nor does the Stipulation, as it does not identify the constituent entities of Elite and Fite or the citizenship of those LLC's members. For this separate reason, the Court cannot determine the citizenship of all of the Plaintiffs and thus Plaintiffs have not carried their burden to show complete diversity.

corporation organized and existing under the laws of the State of Delaware with its principal place of business being located in 10201 West Pico Boulevard, Los Angeles, CA, 90035," (Compl. ¶ 13), NWCA argues that its principal place of business is in Atlanta, Georgia, thereby defeating diversity jurisdiction.

## II.   Legal Standard

Federal Rule of Civil Procedure 12(b)(1) permits a party to move for dismissal of a case if no subject matter jurisdiction exists. The motion may be asserted on either facial or factual grounds. *Carmichael v. Kellogg, Brown & Root Svcs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citations omitted). A facial attack on a complaint "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [the] complaint are taken as true for the purpose of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (internal quotation omitted). Alternatively, a factual attack "challenge[s] the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id*. In the instance of a factual attack, because the court's very power to hear the case is at issue, the court is "free to weigh the evidence and satisfy itself as to  the existence of its power to hear the case." *Id*. Accordingly, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*.

Federal courts have diversity jurisdiction over civil actions where the amount in controversy exceeds $75,000 and where the controversy is between citizens of different states or between citizens of a state and citizens or subjects of a foreign state. 28 U.S.C. § 1332. Diversity jurisdiction "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996); *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir 1998) ("[D]iversity jurisdiction requires complete diversity, meaning that every plaintiff must be diverse from every defendant."); *Strawbridge v. Curtiss*, 7 U.S. 267 (1806). "The presence of [a] nondiverse party automatically destroys original jurisdiction." *Wisconsin Dept. of Corrections v. Schacht*, 524 U.S. 381, 389 (1998).

Diversity jurisdiction is determined at the time of filing the complaint. *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1317 (11th Cir. 2017). "It is to be presumed that a cause lies outside [of the federal courts'] limited jurisdiction, and the burden rests upon the party asserting jurisdiction" to establish its existence by a preponderance of the evidence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002) ("Further, the party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction.")

## III.   Discussion

The dispute here concerns the citizenship of Defendant NWCA, and specifically the location of NWCA's principal place of business.[3] Plaintiffs argue that NWCA's principal place of business is in California, and thus diversity jurisdiction exists; NWCA argues that its principal place of business is in Georgia, and thus diversity jurisdiction is absent since one of the Plaintiffs, Dr. Wampler, is undisputedly a citizen of Georgia.

For purposes of diversity jurisdiction, a corporation is a citizen of the state in which it is incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c). In *Hertz v. Friend*, after reviewing the divergent approaches taken by the Courts of Appeals, the Supreme Court announced that the "nerve center" test dictates the location of a corporation's principal place of business. 559 U.S. 77, 92 (2010). The Court concluded that "'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.*   at 93. In practice, this "should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings." *Id.* The nerve center is a *single place* and "[t]he public often (though not always) considers it the corporation's main place of business." *Id.* As the focus is on a particular place, courts should not attempt to measure "the total

---

[3] The Parties agree that NWCA is a citizen of Delaware, as NWCA is incorporated in that state.

amount of business activities that the corporation conducts in a state overall as compared to other states, as with the "general business activities test" some courts used before *Hertz*. *Id.* at 93, 95 (noting that a corporation's general business activities may often lack a single principal place where these activities take place). Ultimately, the nerve center points "in a single direction, toward the center of overall direction, control, and coordination." *Id.* at 95-96. ("The metaphor of a corporate 'brain,' while not precise, suggests a single location.")

Though the nerve center test is intended to be straightforward "comparatively speaking" (*id.* at 95), the modern complexity of business structures often renders this singular question a thorny one, for example, in cases of a parent corporation and its subsidiary companies, as relevant here. It is, however, a "well-established rule that a parent corporation maintains separate citizenship from a subsidiary unless it has exerted such an overwhelming level of control over the subsidiary that the two companies do not retain separate corporate identities." *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 351 (3d Cir. 2013) (citing *Quaker v. State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir. 1972)); *see also, Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 62-63 (1st Cir. 1993) (emphasizing that, "in determining a corporation's principal place of business, [the] inquiry must focus *solely* on the business activities of the corporation whose principal place of business is at issue.") Courts should be hesitant to disregard "distinctions among the various corporate entities that often comprise large business enterprises" such that the "brain" of every

7

related subsidiary corporation is that of the parent. *SmithKline*, 724 F.3d at 357, n. 23. *See also, DeLuca v. Allstate New Jersey Ins. Co.*, 2011 WL 3794229 (D.N.J. Aug. 25, 2011) (finding that subsidiary defendant's principal place of business was in New Jersey, not Illinois, although parent company was located in Illinois, defendant subsidiary's board of directions met in Illinois, and a number of defendant's officers worked in Illinois); *Astra Oil Trading NV v. Petrobras America, Inc.*, 2010 WL 3069793, at *8 (S.D. Tex. Aug. 4, 2010) (explaining that where the corporate separation between a parent and subsidiary is real and carefully maintained, the separate place of business of the subsidiary is recognized in determining jurisdiction, even where parent company exerts some control; finding that subsidiary's business was directed from California, even though the parent company made significant decisions from Europe).[4]

Here, under the test outlined in *Hertz*, Defendant argues that the "nerve center" for NWCA is 1551 Briarcliff Road in Atlanta, Georgia because the Local Officers in Atlanta "direct, coordinate, and control" NWCA's business activities almost exclusively. (Mot. at 6.) In support, NWCA argues that: (1) NWCA does not conduct business in any state other than Georgia; (2) NWCA operates one station, Fox 5 Atlanta, and broadcasts live from Atlanta 68 hours per week of local news and programming responsive to the needs of the metro-Atlanta community; (3)

---

[4] *See also, EverNu Technology v. Rohm & Haas*, 2010 WL 3419892, at *4 (E.D. Pa. Aug. 26, 2010) (refusing to impute the parent company's principal place of business in Michigan to subsidiary, noting that "every subsidiary's 'nerve center' would necessarily be the location of its parent" where high-level review of the parent company is emphasized over the actual running of the business at issue).

decisions regarding on-air and digital news content are made exclusively in Atlanta; (4) NWCA owns the building in Atlanta that houses Fox 5's news studios; (5) operations, including budgets and finances, are managed from Atlanta; (6) hiring decisions for NWCA are made in Atlanta; and (7) station policies, procedures, and legal decisions are made in the Atlanta office, though NWCA complies with corporate standards of its parent company, Fox Corporation. (Mot. at 5, 13-14.)

In response, Plaintiffs argue that NWCA's "nerve center" is in Los Angeles, California because: (1) NWCA's filings with the Secretary of State's Offices in both Georgia and Delaware list a principal business address in Los Angeles, California; (2) 12 of 21 officers on a NWCA Officer List have addresses in California; and (3) the CEO and CFO of NWCA are located in Los Angeles and that these officers perform important functions. (Pl. Resp., Doc. 73 at 1-3.) Plaintiffs also challenge that the five individuals identified by NWCA as "local officers" are in fact "officers" of NWCA. (*Id*. at 6.)

i.   *Factual Findings*

The record before the Court reflects the following facts. Fox Corporation is the owner and parent company over twenty-eight television stations across the country, including NWCA. (Forrest Dep. p. 182:4-7; 178:23-179:2.) Fox Corporation has designated its subsidiary Fox Television Stations, LLC as the entity that provides oversight and collects certifications from the subsidiary stations to ensure that Fox Corporation complies with federal law as a publicly

traded company. (*Id*. p. 85:11-19.) Thus, NWCA is an indirect subsidiary of Fox Corporation. (*Id*. p. 181:6-11.)

NWCA has a three-member Board of Directors. The Board has appointed 21 officers. Most of these officers are attorneys and are located across the country: 12 have addresses in Los Angeles (though at three different locations)[5], 6 in New York City, two in Washington, D.C., and one in Atlanta, Georgia. (NWCA Officer List, Doc. 64-2.) Of these 21 officers, NWCA's CEO is Jack Abernathy, who has a Los Angeles address, though he previously only had an office in New York before the fall of 2018. (Forrest Dep. 184:10-12.) Jack Abernathy is also the CEO of Fox Television Stations, LLC, the entity overseeing all subsidiary stations. (Forrest. Dep. 83:25-84:1.)

According to NWCA's corporate representative, Carolyn Forrest, NWCA's 21 officers are "Shared Service Officers" that provide "shared services" for *every* subsidiary company of the parent company Fox that operates a TV station. (Forrest Dep. p. 27:10-16) ("**This exact list exists for every subsidiary company, so that everyone on this list is able to perform services, upon request, for every subsidiary company that operates a television station in the Fox family**.") These "Shared Service Officers" provide expertise to subsidiary companies in particular areas, such as regulatory FCC compliance (Forrest Dep. 114:9-16); human resources and payroll services (*id*. p. 46:18-47:14, 118:25-119:8),

---

[5] Although 12 officers have addresses in Los Angeles, only three are listed as having a work address at 10201 West Pico Blvd., the site Plaintiffs contend is the NWCA's principal place of business. (NWCA Officer List, Doc. 64-2.)

or tax services (*id.* p. 99:8-16, 117:15-118:23). Some of these Shared Service Officers provide no services to NWCA, for example, a labor relations specialist who deals with stations that have unions, which NWCA does not. (*Id.* p. 27:18-25).  In Ms. Forrest's over 26 years of experience as a member on the NWCA Officer List, there has never been a meeting amongst these officers, or even a conference call to gather the NWCA officers for NWCA business. (*Id.* p. 34:24-35:20, 36:18-21.) NWCA pays significant amounts out of its own local budget for the services of these Shared Service Officers. (Supplemental Declaration of William J. Schneider, Doc. 64-3 ¶¶ 3-4, Doc. 68.) And though Mr. Abernathy is named CEO of NWCA, and, as the Court understands, the other local subsidiary stations, he "does not get involved and make decisions to run the business;" instead, he ensures that the stations are fulfilling their legal obligations to the parent company and ensures that these stations have necessary support services. (Forrest Dep. p. 111:14-25.)

Thus, as structured, these Shared Service Officers, including Mr. Abernathy, do not direct, control, or coordinate the business of NWCA and only provide oversight and ensure that NWCA and Fox's other subsidiaries operate their stations in compliance with the law. (Forrest Dep. p. 204:10-13.) Instead, these Shared Service Officers have delegated the responsibility of directing, coordinating, and controlling the business affairs of NWCA to a core group of five Local Officers, who direct, control, coordinate, and manage NWCA from Atlanta. (*Id.* p. 210:19-23.)

These Local Officers are William Schneider, Senior Vice President and General Manager; Michael Holmes, Vice President of Finance; Jim Mannix, Vice President of Sales; Scott Stuckey, Vice President of News; Rick Snyder, Vice President of Creative Services; and Neil Mazur, Vice President of Engineering. (Forrest Dep. p. 18:22-19:6.)[6] The Local Officers were delegated these responsibilities through their employment agreements. (Forrest Dep. p. 82:6-9; 138:18-20.) (Employment Agreements, Docs. 73-8, 73-9, 73-10, 73-11, 73-12, 73-13) (noting, for example, that Mr. Schneider "shall serve as Vice President, General Manager, WAGA").

NWCA's (New World Communication *of Atlanta*) core business and raison d'être is producing and broadcasting local news and programming for the metro-Atlanta community through its news station Fox 5 *Atlanta*. NWCA holds a TV Broadcast License exclusively for the operation of Fox 5 Atlanta, a station which reports news and produces programming responsive to the needs of the metro-Atlanta community. (Declaration of William J. Schneider ("Schneider Decl."), Doc. 6-2 ¶ 6.) NWCA's application filings with the FCC reflects that the "Community of License/ Area to be Served" is Atlanta, GA. (Doc. 66-1, Ex. 16, p. 95.) Annual FCC reports submitted by NWCA list a location of Atlanta, GA. (*Id.*, Ex. 15, p. 65; Ex.

---

[6] Plaintiffs emphatically contend that NWCA admitted in its discovery responses that the 21 officers direct, control, and coordinate NWCA's activities. (Pl. Resp. at 2-3.) Indeed, NWCA's discovery responses indicate that officers appointed by the Board of Directors do control NWCA's activities, but as NWCA's corporate representative testified, the local Atlanta officers are appointed by the Board through the Board's delegated authority (Forrest Dep. pp. 21:2-11; 80:2-82:12); thus, this response is not inconsistent with NWCA's position that the local Atlanta officers direct and control the Fox 5's (and thus NWCA's) business activities from Atlanta.

17, p. 102.) NWCA's sole business location is at 1551 Briarcliff Road NE in Atlanta, and NWCA does not conduct business in any state outside of Georgia. (Schneider Decl. ¶¶ 3-4.)

The record further reflects that all activity attendant with running Fox 5 Atlanta's broadcast station involves *decisions made and authorized* in Atlanta by the Local Officers. All NWCA/ Fox 5 content is produced, broadcast, and directed from NWCA's sole location in Atlanta, Georgia. (Schneider Decl. ¶¶ 6-8.) The Local Officers make all decisions about on-air and digital news content, for example, in determining to produce a political recap show leading into election season or deciding to pursue rights to preseason Atlanta Falcons games through negotiations with Falcons management. (Schneider Decl. ¶ 8; Deposition of William J. Schneider ("Schneider Dep."), Doc. 67, pp. 42-46.)

 Decisions regarding the allocation and spending of NWCA's budget are made locally. (Schneider Decl. ¶ 7.) Long-term budgets and financial objectives are debated and developed over months and years in Atlanta by Mr. Schneider, Mr. Holmes (VP of Finance) and department heads. (Schneider Dep. p. 117:8-118:9.) A consolidated budget is ultimately submitted to CFO Mike Nelson for approval, but he is not involved in the particulars of the budget development. (*Id*.) In addition, hiring decisions are made locally. (Schneider Decl. ¶ 9.) The Local Officers also "have the authority to make their own policies and procedures" to operate their business, though they comply with corporate guidelines. (Forrest Dep. p. 49:12-17.) The Local Officers are responsible for certifying that they have established

internal controls for financial reporting are in compliance with the law; the Local Officers must attest to these certifications because they are "the only officers who are directing and controlling what's happening and … are in a position to certify that there are internal controls and compliance with law." (Forrest Dep. p. 85:20-24.)

Other key technical and financial aspects of running the business are controlled by the Local Officers in Atlanta. Leases and licenses for antenna and tower sites are executed by Mr. Mazur, the VP of Engineering and Operations. (Doc. 67-1 pp. 234, 264, 277, 281), as are licenses for video equipment (*id*. pp. 283, 285, 288, 290, 301). NWCA owns the real estate in Atlanta where Fox 5 develops its content and pays significant business license and property taxes in Georgia.[7] Mr. Holmes, the VP of Finance, located in Atlanta, coordinates and signs off for NWCA on these state tax documents. (*See e.g*., Doc. 67-1 pp. 28, 38, 40, 42, 43.) Other official property agreements that NWCA enters into are executed locally by Ms. Forrest. (*See* Joint Declaration of Easements, Doc. 67-1 pp. 359, 392, 401.)

In addition, NWCA/ Fox 5 Atlanta has been a defendant in approximately ten lawsuits in the past decade, nine of which were in Georgia state courts and one, involving an alleged violation of the Fair Labor Standards Act, was in federal court; this complete list includes no cases in other states. (Complete List of Lawsuits, Doc. 65-2 p. 4-11; Forrest Dep. p. 151:22-25.) Ms. Forrest represented that any time a

---

[7] *See* Business and Occupational Tax Documents for NWCA, Doc. 67-1, Ex. 9. *See also* Personal Property Tax Statement, Doc. 67-1 p. 59-78.

litigant has used NWCA's Atlanta address, NWCA has not denied that it is the principal place of business for NWCA. (Forrest Dep. p. 187:7-9.)

ii.     *The Nerve Center Test*

Based on the thorough record before the Court as recounted above, Plaintiffs have not carried their burden to establish that the nerve center of NWCA is 10201 West Pico Blvd., Los Angeles, California. *Hertz*, 559 U.S. at 96 ("The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it .... When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof."). Instead, the evidence leads the Court to conclude that 1551 Briarcliff Road NE in Atlanta is NWCA's nerve center. As detailed thoroughly above, the core business activities attendant with running NWCA's news production and broadcasting business — what content will be produced, by who, where, using what equipment and technology, and with what budget — are  controlled, directed, and coordinated in Atlanta by the Local Officers. In short, the "brain" of NWCA lives and breathes in Atlanta.

Plaintiffs' arguments to the contrary rely on form over substance and are insufficient to establish that NWCA's principal place of business is Los Angeles. First, Plaintiffs' heavy reliance on filings with the Georgia and Delaware Secretaries of State are not "sufficient proof to establish [NWCA's] 'nerve center.'" *Hertz*, 559 U.S. at 97 (explaining that SEC form listing a corporation's "principal executive offices" is insufficient to show principal place of business, as such a finding would "readily permit jurisdictional manipulation."). *See also, Wylie v.*

*Red Bull N. Am., Inc.*, 627 F. App'x 755, 758 (11th Cir. 2015) (holding that corporate filing with Georgia Secretary of State listing "Principal Office Address" as in California, and lists identifying CEO, CFO, and Secretary as sharing that California address, does not establish that company's principal place of business is in California under the "nerve center" test); *Sheets v. F. Hoffman-La Roche. Ltd.*, 2018 WL 6428460, at *3 (N.D. Cal. Dec. 7, 2018) (finding that defendant's primary reliance on filings before the New Jersey Treasury Department and California Secretary of State to establish principal place of business were unpersuasive in light of the Supreme Court's instruction in *Hertz*); *In re Lorazepam & Clorazepate Antitrust Litig.*, 900 F.Supp.2d 8, 18 (D.D.C. 2012) (finding that corporate annual reports filed with Massachusetts Secretary of State listing principal office address and addresses for corporation's officers and directors were insufficient proof of principal place of business).[8]

Similarly, Plaintiffs' reliance on the addresses of the officers on the "List of Officers" (Doc. 64-3) is also misplaced. While true that 12 of the 21 officers on the

---

[8] Plaintiffs cite for support *Motyl v. Franklin Templeton Co.*, LLC, 2014 WL 1413434 (S.D. Fla. Apr. 11, 2014). The *Motyl* Plaintiffs sought a remand of the case to a Florida state court, maintaining that various corporate filings indicated that Florida should be deemed the company's actual operating headquarters. But the district court denied the remand motion, holding that the defendant's officers operated out of California and the bulk of defendant's business activities occurred in or were directed in California, not Florida, as the plaintiff had argued. The plaintiffs' evidence consisted primarily of various corporate filings listing the defendant's principal place of business as in Florida. *Id.* at *3-4. Plaintiffs' similar primary reliance on corporate filings in the instant case also cuts against Plaintiffs here where they have offered meager other substantive evidence of California based "nerve center" activity. Here, the bulk of NWCA's corporate activities occur in Atlanta, at the direction of executives in Atlanta, rendering the *Motyl* case factually inapposite and unhelpful to Plaintiffs' position.

list are identified as having various California addresses (and only three at 10201 West Pico Blvd.), this is insufficient to show that NWCA "directs, controls, and coordinates" the corporation's activities from Los Angeles. Plaintiffs have not provided specific evidence of ways in which these California-based officers, including the Mr. Abernathy, direct, control, or coordinate the business of NWCA. Nor have Plaintiffs provided any evidence to contradict NWCA's evidence that core business decisions are instead made by the local executives in Atlanta. Plaintiffs argue that NWCA admits, through the testimony of its corporate representative, that the Shared Service Officers such as Mr. Abernathy play important roles. (Pl. Resp. at 4.) As detailed above, Ms. Forrest testified that Mr. Abernathy ensures that all member stations are fulfilling their legal obligations to the parent company and are supported in running their businesses but he "does not get involved and make decisions to run the business." (Forrest Dep. p. 111:15-23; 112:2-9.) Further, Ms. Forrest testified that:

> [H]e provides overall oversight, but he doesn't participate in making decisions about how each individual company that's operating a television station is fulfilling its responsibilities under FCC license to serve the needs and interests of its community. He doesn't have any knowledge of the individual communities but for what he's told by the general managers.

(*Id*.) Plaintiffs also rely on evidence that Mr. Schneider, Defendant's Senior Vice President and General Manager, sends monthly management reports to the CEO (Pl. Resp. at 4.) Ms. Forrest testified that these reports are sent so that the CEO "can learn what's going on at the stations, because he's not aware." (*Id.* p. 83:25-

84:8) (further noting that Mr. Abernathy is the CEO of Fox Television Stations, the company designed as providing oversight to ensure that subsidiary companies in the Fox family comply with laws and follow their budget). This evidence thus does not establish that core decision-making and control occurs at a central nerve center in Los Angeles.

In arguing that the Court should look *only* to the addresses of the Shared Service Officers, Plaintiffs oversimplify the nerve center test articulated by the Supreme Court in *Hertz*. It is not simply the addresses of certain officers that are relevant to the jurisdictional question; the crux of this inquiry asks where the corporation's activities are *directed, controlled, and coordinated. See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 356 n. 21 (3d Cir. 2013) (noting that *Hertz* does not require a court to ignore evidence suggesting where activity is actually controlled (there, by the board of directors) in favor of the location of certain corporate officers, finding that principal place of business was Delaware, although an array of tax and strategic support services were performed by officers in London and Philadelphia).

Defendant NWCA points the Court to *Moore v. Johnson & Johnson*, 907 F.Supp.2d 646, 659-660 (E.D. Pa. 2012). In *Moore*, the defendant company (a subsidiary company of Johnson & Johnson) argued that its principal place of business was New Jersey, whereas the plaintiff argued that it was Pennsylvania. In a thorough decision, the court held that the company's principal place of business was New Jersey, even though three principal officers – the President, Vice

President/ CFO, and Secretary — worked in Pennsylvania. *Id.* at 659. The *Moore* Court determined, based on the record before it, that these higher-level officers did not manage the relevant business of producing, distributing, and marketing consumer brands, which was instead done by certain senior executives, only one of whom was an officer of the company, operating in New Jersey. *Id.* at 659-660. The court so concluded, even though the higher-level officers technically possessed the authority under corporate by-laws to supervise all business activities. *Id.* at 659.[9] *See also*, *Arndt v. Johnson & Johnson*, 2014 U.S. Dist. LEXIS 28629, at *18 (E.D. Pa. Mar. 5, 2014) (embracing *Moore*, *supra*, similarly finding that, although some high-level corporate officers were located in Pennsylvania, these officers "do not, in fact, direct, control, or coordinate" the company's business as whole); *In re Lorazepam*, 900 F.Supp.2d at 18 ("The listing of addresses, presumably in some cases home addresses, offers little in the way of support for where the companies' officers *actually* 'direct' and 'coordinate' corporate activity."); *Pool v. F. Hoffman-La Roche, Ltd.,* 386 F. Supp. 3d 1202, 1220 (N.D. Cal. 2019) (concluding that defendant had not established that New Jersey was principal place of business even though the majority of officers were located there, noting "sheer numbers are not dispositive"); *DeLuca*, 2011 WL 3794229, *supra*, (finding that defendant had not shown that Illinois was its principal place of business, even though Illinois was the

---

[9] In *Moore*, the plaintiffs moved for reconsideration arguing that the Court erred in focusing on the company's day-to-day activities. The *Moore* Court held an evidentiary hearing and issued a second decision reiterating its first conclusion, finding that the company's principal place of business was New Jersey. *See Moore v. Johnson & Johnson*, 2013 WL 5298573 (E.D. Pa. Sept. 20, 2013) ("*Moore II*").

location of its parent company, the location where the defendant's board of directors met, and the location where a number of defendant's officers worked; instead determining that the defendant's principal place of business was New Jersey because defendant was a subsidiary company created specifically to address New Jersey market and operated almost exclusively in New Jersey controlled by New Jersey leadership). Here, the clear testimony shows that the "lawyers and accountants" that give general legal or tax advice to Fox's subsidiary companies like NWCA, do not "control[] or coordinat[e] the station and frequently, they only know a teeny bit about the station .... That person knows nothing more about the news gathering or the engineering or anything else going on at the station." (Forrest Dep. p. 139:2-10.) Under the circumstances, substantive and real control cannot be eschewed in the name of corporate formalities.

Plaintiffs criticize *Moore* and its reasoning. They point to cases in which courts correctly explain that the jurisdictional analysis depends on more than the location of the day-to-day activities of the corporation. *See e.g., Cali v. Joe Ryan Enterprises, Inc.*, 65 F.Supp.3d 1288 (M.D. Ala. 2014); *Hoschar v. Appalachian Power Co.,* 739 F.3d 163, 172 (4th Cir. 2014); *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 105 (4th Cir. 2011); *Celli v. Greenwich Ins. Co.*, 2020 WL 4698509 (D. Mass. Aug. 13, 2020). While this principle is indeed correct, Plaintiffs attempt to stretch the authority to an overly formalistic reading. For example, Plaintiffs cite *Cali*, 65 F.Supp.3d 1288, *supra*, for the proposition that courts should *only* evaluate officers' functions and the location of

business activities in cases where equal number of officers exist in different states. (Pl. Resp. at 9-10.) But *Cali* does not cabin the jurisdictional analysis so rigidly. There, the court assessed a jurisdictional dispute involving a business with only two primary officers, one in Georgia and one in Alabama, and nowhere did the court articulate that a practical assessment of the functions of officers should *only* be addressed under such circumstances. Moreover, in that case, the court, as here, focused on "who is directing, controlling, and coordinating those operations." And as here, "the daily operations happen to occur at the same locale where those operations are directed, controlled, and coordinated … the operations facility and the nerve center collide." *Id*. at 1294. (noting that defendant was not a corporation with "far flung" and multiple business operations controlled from a separate, central site; rather the operations occurred at a single location).  Here, the Court does not focus on the locus of the day-to-day activities or daily management, but instead finds that the individuals making the significant corporate decisions and directing NWCA's policies and operations are directing NWCA from Atlanta.

Plaintiffs also cite *Mountain State Carbon* and *Hoschar, supra,* in support of their position that day-to-day activities are "not relevant to the nerve center test." (Pl. Resp. at 11.) In *Mountain State Carbon*, the court concluded that if a corporation's day-to-day operations are managed in one state, while its officers *make significant corporate decisions and set policy in another*, the principal place of business is the latter. 636 F.3d at 106. The *Hoschar* Court reiterated that determination in finding that while the defendant company's day-to-day

operations were managed in West Virginia, its officers directed, controlled, and coordinated the company's activities from Ohio. 739 F.3d at 172-73.

To repeat, the key question demanded by the nerve center test asks where decisionmakers control, coordinate, and direct the business of the company. And while that remains the ultimate question, to determine its answer a court must assess what type of business activities are being controlled, coordinated and directed. *SmithKline*, 724 F.3d at n. 21 (explaining that to determine the actual center of direction, control and coordination, "we first have to acknowledge the nature of a corporation's activities, as it is difficult to locate a corporation's brain without first identifying its body"). On the record before the Court, as described above, the officers controlling, coordinating, and directing NWCA and its local broadcasting business are the Atlanta officers. Unlike in *Moutain State Carbon* or *Hoschar*, Plaintiffs here have not shown by a preponderance of the evidence that any higher-titled officers are actually and substantively directing, controlling, and coordinating the operations of NWCA, let alone from a central location at 10201 West Pico Blvd in California, as opposed to a location in New York or Washington, the other listed officer locations.[10]

---

[10] For this reason, *Celli*, 2020 WL 4698509 is also inapposite. There, the defendant argued that a single alleged executive located in New York, who was an employee of a different subsidiary company, controlled the defendant corporation. *Id*. at *3. The record showed that a majority of the corporate officers operated out of Massachusetts, and that the company's administrative office, the location of books and records, and the location of board meetings was in Massachusetts. *Id*. There was nothing in the record to dispute that the corporate officers in Massachusetts exercised ultimate control over the company. Here, there is significant evidence that a core group of decisionmakers exercise control over NWCA's business from Atlanta. Plaintiffs also rely on *Tamiami Condo. Warehouse Plaza Ass'n, Inc. v. Markel Am. Ins. Co.*, 2019 WL 4854271, at *2

Plaintiffs' next attack NWCA's evidence that the Atlanta leaders are "Local Officers" by arguing that these officers were not appointed through proper corporate procedures. (Pl. Resp. at 5-6, 18-21.) None of the cases upon which Plaintiffs rely to argue that the local Atlanta executives are not truly officers of NWCA/ Fox 5 Atlanta involve a jurisdictional issue or analysis. Instead, these cases involve questions of corporate liability concerning the fiduciary duties of employees, or the scope of insurance coverage for employees, officers, and directors for personal injury and negligence claims. (Pl. Resp. at 19-21[11].) Further, while Plaintiffs emphasize that the Atlanta leaders' employment agreements are with Fox Television Stations, LLC, those agreements clearly state that, for example in the case of Mr. Schneider, "You shall serve as Vice President, General Manager, WAGA."  (Doc. 73-8.) WAGA-TV are the call letters for the sole station NWCA operates (Fox 5) under its FCC license. (Forrest Dep. p. 209:13-14.)[12] NWCA's primary business involves holding the broadcast license for WAGA-TV Fox 5 Atlanta and operating Fox 5 Atlanta in accordance with that license to provide programming responsive to the needs of the metro-Atlanta community. (Schneider

---

(S.D. Fla. Oct. 2, 2019), an entirely inapplicable case. There, the plaintiff, in arguing that defendant's principal place of business was in Florida, relied only on two pages from defendant's website indicating that it had a single office in Florida with 77 brokers, which was contradicted by an abundance of evidence that defendant's marketing, underwriting, claim handling, litigation, and other significant activities were controlled and directed from Virginia.

[11] Citing *Select Portfolio Servicing, Inc. v. Evaluation Sols., L.L.C.*, 2006 WL 2691784, at *9 (M.D. Fla. Sept. 20, 2006); *Bruce v. Travelers Ins. Co.*, 266 F.2d 781, 784 (5th Cir. 1959); *Guillory v, Aetna Ins. Co.*, 415 F.2d 650, 653 (5th Cir. 1969); *Lemmons v. Zurich Ins. Co.*, 403 F.2d 512, 514 (5th Cir. 1968); *Paulsen v. Stifel, Nicolaus & Co*., 2019 WL 2415213, at *4 (S.D.N.Y June 4, 2019),

[12] As noted, the Parties agree that "WAGA," "Fox 5," and "NWCA" all refer to the same entity, the Defendant in this case. (Forrest Dep. p. 14:8-23.)

Decl. ¶ 6.) Moreover, a review of the list of the 21 other individuals that Plaintiffs agree are officers of NWCA indicates that all those individuals are employed by either Fox Television Stations, LLC or Fox Corporation, not NWCA. (Doc. 66-1, p. 1-3.)[13]

In addition, Defendant's compliance with Delaware's corporate requirements for properly designating officers is not material to the empirical fact question of where the nerve center of the corporate operations is located. Even if the local executives — Mr. Schneider, Mr. Holmes, Mr. Mannix, Mr. Stuckey, Mr. Snyder, and Mr. Mazur — are not, as Ms. Forrest testified, "officers" of NWCA, the evidence shows that the core business activities of NWCA were being conducted and directed by them and from Atlanta. *See*, *Moore II*, 2013 WL 5298573, at *7 (finding that non-officers directed, controlled and coordinated the operations of the corporation, explaining that "[w]hen 'the facts … suggest that [a] particular corporation did not vest the relevant decision-making in its officers,' those officers do not comprise the corporation's nerve center.") (quoting *SmithKline*, 724 F.3d at n. 21); *see also*, *Volkert, Inc. v. Fin. Tech. Corp.*, 2019 WL 7576350, at *3 (M.D. Tenn. Dec. 23, 2019), *report and recommendation adopted*, 2020 WL 134227 (M.D. Tenn. Jan. 13, 2020) (finding that defendant's principal place of business

---

[13] Plaintiffs also argue that the Local Officers are not officers because of a NWCA Board Resolution from March 2019 resolves that all persons serving as officers prior to that date were thereby removed and includes an updated list of the 21 official officers. (Doc. 73-5.) This resolution says nothing about individuals who run Fox 5 Atlanta. It also does not show that the local Atlanta executives were not delegated with decision-making authority through their employment agreements or that they did not in fact control, coordinate, and direct the business of NWCA.

was Alabama, not Tennessee, where evidence showed that defendant's business was controlled from Alabama by a non-board member in contravention of by-laws stating that defendant was to be managed by board of directors, and where defendant was not authorized to transact business in Alabama).

As the above legal authority illustrates, the nerve center inquiry must focus on the central location of control of the relevant company. The crux of the inquiry asks what the evidence shows in terms of where the corporation's operations are directed and controlled. Corporations vary widely in terms of leadership structure and the allocation of decision-making authority, and "a court's nerve center analysis need not woodenly focus on a corporation's officers and can take stock of corporate realities." *Moore II*, 2013 WL 5298573, at *7. Under the facts *here*, Plaintiffs have not carried their burden to show the existence of federal diversity jurisdiction by a preponderance of the evidence. The Complaint does not allege and Plaintiffs have not established the citizenship of the LLC Plaintiffs, Elite and Fite. On top of that, Plaintiffs have not shown by a preponderance of the evidence that NWCA's principal place of business and nerve center is 10210 West Pico Blvd in Los Angeles, California. Plaintiffs, like nearly all other plaintiffs who have sued NWCA within the past decade (Doc. 65-2 p. 4-5), are of course free to pursue their claims in the Georgia state courts.

## IV.   Conclusion

Because Plaintiffs have not carried their burden to show by a preponderance of the evidence that diversity jurisdiction exists, Defendant's Motion to Dismiss

[Doc. 64] is **GRANTED** and this case is **DISMISSED without prejudice** for lack of jurisdiction. The Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 28th day of April, 2021.

_____
**Honorable Amy Totenberg**
**United States District Judge**